## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID ZENO, individually, and on )
behalf of all others similarly situated, )
            Plaintiff, )
             )
 v. )  Civil Action No. 05-418
             )
FORD MOTOR COMPANY, INC., )
            Defendant. )

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court is a motion for class certification (Doc. No. 30) filed pursuant to Federal Rule of Civil Procedure 23(b)(3) in the above-captioned civil action by David Zeno ("plaintiff" or "Zeno"). Plaintiff seeks statewide class certification of a single claim of breach of contract for persons who purchased or leased from defendant Ford Motor Company, Inc. (the "defendant" or "Ford"), a new model year 2000 or 2001 F-150 truck with either the Heavy Duty Electrical Cooling Group option or the Class III Trailer Towing option and who did not receive a new upgraded radiator (1.42 inches thick) either at the time of purchase or lease or as a free replacement thereafter. See Pl.'s Mot. for Class Certification ("Pl.'s Mot.") ¶2.[1]

On April 28, 2006, the court held a class certification hearing. On May 26, 2006, the parties submitted proposed findings of fact and conclusions of law (Doc. Nos. 77, 78). For the reasons set forth herein, the court will grant plaintiff's motion.

---

[1]See Part I infra for plaintiff's precise proposed class definition.

Pursuant to Federal Rule of Civil Procedure 52, this court makes the following findings of fact and conclusions of law.

# I. CLASS DESCRIPTION

Plaintiff seeks in his motion the certification of a state-wide class limited to the Commonwealth of Pennsylvania.  Plaintiff seeks certification of a class defined as follows:

> All persons who purchased or leased in the Commonwealth of Pennsylvania a new model year 2000 or 2001 F-150 truck with either the Heavy Duty Electrical Cooling Group option or the Class III Trailer Towing option and did not receive a new upgraded radiator (1.42" (36mm) in thickness) from Ford Motor Company, Inc., either at the time of the purchase or lease, or as a free replacement thereafter.

Pl.'s Mot. ¶2.

# II. FACTUAL BACKGROUND

## A. Plaintiff's Purchase of a Ford F-150 Truck with a Towing Option

1.  Plaintiff purchased a new Ford F-150 truck in May 2001 from Lake View Ford in Conneaut Lake, Pennsylvania.  Pl.'s Proposed Findings of Fact ("PFF") ¶59; Def.'s Proposed Findings of Fact ("DFF") ¶1.  Lake View Ford is an authorized Ford Dealer.  PFF ¶59; Complaint ("Compl.") ¶11; see also Pl.'s Mot., Ex. A (Deposition of David Lenz ("Lenz Dep.") at 211-12.[2]

---

[2]Following the convention of the parties, the court cites the deposition transcript page numbers, not the document page numbers generated by the court's electronic filing system, when citing deposition testimony.  A similar convention is adopted for other exhibits.

2.  At or around the time of purchase, plaintiff received a window sticker describing the vehicle that he purchased.  PFF ¶60.  Ford makes and attaches a window sticker to every F-150 truck that it manufactures.  Id. ¶3; see Lenz Dep. at 39-40.  Ford's window stickers generally list, among other things, the vehicle identification number (commonly known as the "VIN"), the options included on the vehicle, and the Manufacturer's Suggested Retail Price ("MSRP") for the vehicle and various options.  Id. ¶¶5-7.

3.  The window sticker on plaintiff's F-150 truck indicated that it included a Class III Trailer Towing option (the "towing option").  PFF ¶59; DFF  ¶8.  The window sticker showed that the total MSRP for plaintiff's F-150 truck was $29,625.00 and that this total MSRP included a MSRP of $350.00 for the towing option.  DFF ¶7 (citing DFF Exhibit ("Ex.") D (Plaintiff's window sticker));[3] PFF 60 (citing Deposition of David Zeno "Zeno Dep.") at 30-31; Comp. ¶12.  Plaintiff testified that he initially was not looking for a towing package, but when offered a vehicle with a towing package he figured it would be better for him.  Zeno Dep. at 23-25.

4.  The purchase agreement for plaintiff's vehicle was signed by plaintiff and an authorized representative of Lake View Ford.  DFF, Ex. F.  It indicated the price of plaintiff's vehicle, the VIN number, warranty information, and other information but did not include whether the vehicle was equipped with options or what type of radiator the vehicle included.  Id.  It reflected, and the parties stipulated, that plaintiff paid $29,125 for his vehicle, $500.00 less than the MSRP.  Id.  The purchase agreement reflects this $500.00 difference in price as code "#1110."  Id.

---

[3]Defendant cites "Ex. E" to DFF and "Ex. D" to Def. Opp. Br.  The window sticker, however, is attached to Ex. E, Tab D of DFF.

5. Plaintiff testified that there was no negotiation over the price.  Zeno Dep. at 26-27.

6. Ford maintains that dealerships have discretion with respect to pricing options on the vehicles that they sell and pricing for options varies significantly depending on the individual negotiations between the sales person and customer for any sale.  DFF, Ex. F (Affidavit of Gregg Ciocca) ("Ciocca Aff.") ¶2.[4]  Gregg Ciocca, president of a dealership in Quakertown, Pennsylvania, with thirty years of experience, stated that a sales department could charge the suggested retail price, some other price, or no price, for a given option such as the towing and cooling options relevant in this lawsuit.  Id.

7. Mr. Ciocca stated that in some cases a sales representative may use and even provide the customer with certain sales and marketing literature about a particular model vehicle.  In other cases, a customer, however, may not look at any marketing literature at the dealership.  Id. ¶3.  He further acknowledged that:

> In addition to the marketing literature that may be reviewed by the customer, Ford Motor Company provides the dealership with a dealer order guide, which contains detailed information about particular options.  Few customers ask to see the dealer order guide, and the sales person would generally not show the dealer order guide to the customer.  During a typical sales transaction, our salespeople do not make representations to customers about the specifications of the radiator that comes with a particular vehicle or option package.

Id.

8. Plaintiff did not recall seeing the 2001 F-150 Sales Brochure that references "Super Engine Cooling."  He, however, did recall that he "perused the marketing pamphlets that were

---

[4]Defendant cites "Ex. E" to DFF and "Ex. F" to Def. Opp. Br.  The Ciocca Affidavit, however, is attached to Tab F of DFF.

available" and even took one with him, although he no longer possessed it at the time of his

deposition.  Zeno Dep. at 10, 28.  Plaintiff did not recall whether any literature he looked at

referenced an upgraded radiator.  Id. at 28.  Plaintiff testified that while he knew he was

purchasing a towing package, there were no discussions about the radiator when he purchased the

vehicle.  Id. at 59.  He recalled the marketing materials he saw as follows:

> [I]t said there was a trailer towing package and there was several
> components.  I can't remember specifically what they were.  In
> other words, when I looked at the truck, I looked at it, "This is
> better than getting an aftermarket towing hitch because the truck is
> equipped to handle it."

Id.

9.  When asked whether his complaint was based upon his vehicle not being equipped to

handle the towing hitch, over objection, plaintiff responded that his "complaint is that I

purchased a towing package, I paid a premium for it, and I did not get the complete package."  Id.

Plaintiff testified that he was generally satisfied with the performance of his vehicle, he never

towed anything with his vehicle, and he never experienced any problems with his vehicle's

radiator or the towing package.  Id. at 44-46.  In particular, he testified that the engine never

overheated, the engine temperature gauge never registered in the red zone, and the radiator never

caused any damage to his vehicle.  Id. at 46.

10. Plaintiff's window sticker did not specify the type of radiator installed in plaintiff's

vehicle or the component parts included in the towing option package.  DFF ¶8.  There is other

evidence in the record, however, as recounted below, that suggests that the towing option and

another option package which was a component of the towing option, the Heavy Duty

Electrical/Cooling Group option (the "cooling option"), were supposed to include, among other things, an upgraded radiator. Plaintiff maintains that references to "Super Engine Cooling (radiator upgrade)," "radiator upgrade," and "upgraded radiator" for the towing and cooling options entail that plaintiff and others who purchased these options paid for 1.42" radiators and received standard 1.02" radiators instead.[5] Defendant maintains that plaintiff and others received the functionality for which they had paid.

11. Plaintiff's window sticker showed that his vehicle included the towing option. Plaintiff's vehicle, however, was built with the standard 1.02" thick radiator and not the 1.42" radiator which plaintiff alleges is the upgraded radiator to which he was entitled. PFF ¶¶60, 63. Plaintiff never received an upgraded radiator from Ford. Id. ¶64. Plaintiff was never mailed a letter and never received any of the customer satisfaction options from Ford. Id. ¶65. Several years later, plaintiff resold his vehicle to a Chevrolet dealership as a trade-in on a Chevy truck. Zeno Dep. at 34.

**B. Ford Learns of Potential Radiator Issues with F-150 Trucks in September 2000**

12. On September 29, 2000, Ford's radiator supplier Visteon Climate Control Systems notified Ford that all Ford F-150 trucks equipped with the towing option and cooling option mistakenly had been built with the "standard radiator" instead of the "upgraded radiator

---

[5]The record suggests that by "upgraded radiator" or "radiator upgrade" as it pertained to the towing and cooling options, the parties are referring to a 1.42" or 36mm thick radiator and by "standard radiator" the parties are referring to a 1.02" or 26mm radiator. See Lenz Dep. at 31-32, 45-47 (comparing the upgraded radiator with the standard radiator, referring to the "1.42" radiator" and the "1.02" radiator"). Plaintiff's proposed class definition refers to the upgraded radiator as "1.42" (36mm)" thick. Elsewhere in the record, this radiator is variously referred to as 1.42" or 36mm thick.

described in the ordering guide." <u>See</u> Lenz Dep., Ex. A3.[6]  Peter Kanefsky, who was at the time

Ford's Manager of Global Core Engineering and was responsible for vehicle cooling, prepared a

confidential evaluation entitled "Field Service Evaluation Paper (14D) Transmittal" (the "14D

Report") with subject line "2000-01 MY F150 Wrong Radiator – Class III Trailer Tow Opt."

<u>See</u> Lenz Dep., Ex. A3.  Two directors indicated their concurrence with and two vice presidents

indicated their approval of this report by signing the front cover.  <u>Id.</u>; <u>see also</u> Lenz. Dep. at 20-

21.  Two of these individuals dated their signatures September 4, 2001 and September 7, 2001.

Lenz Dep., Ex. A3.[7]

    13. The 14D Report described the problem as follows:

> On September 29th 2000, Visteon Climate Control Systems
> reported to Ford that all F150 vehicles with standard payload, built
> since 8/2/99 and equipped with the Heavy Duty Electrical/Cooling
> Group (Option #531) or Class III Trailer Towing Group (Option
> #535), had been built with the standard radiator rather than the
> "upgraded radiator" described in the vehicle ordering guide. . . .

<u>Id.</u> at 1.  The 14D Report further described the problem stating that "[i]n 2000-2001MY a

standard performance radiator was released in place of the upgraded performance radiator

specified in the PDL and marketing literature for Option #531 or #535, except on vehicles with

the 7700# payload upgrade Option 627."  <u>Id.</u>

---

[6]This document was produced by Ford subject to a protective order and filed under seal.

[7]It is unclear when the report was prepared, although the electronic footer of the original document indicates a date of "8/15/01" which could be, but is not necessarily, the date the report was prepared.  <u>See</u> Lenz. Dep., Ex. A3 at 1-9.

14. With respect to the description of the "root cause" of the problem, the 14D Report further indicated that "[t]he F150/250 program offers two levels of cooling performance; a base performance and a customer purchased upgrade to Super-Duty, for trailer towing and heavy duty operation." Id. at 2. As described, the root cause was the result of misunderstandings concerning certain Product Direction Letters ("PDL") for the F150/F250. See id. "Due to a misunderstanding of this PDL" and a problem with feature codes, an "error compounded by the fact that Standard performance radiator was release [sic] against the [Trailer Tow Prep Pack (Option 531)] feature code rather than the Super performance radiator as required by the PDL," "all derivatives ordered with the Heavy Duty Electrical/Cooling Group (Option 531) or the Class III Trailer Towing Group (Option 535) were built without the upgraded radiator, unless they also had a payload upgrade package." Id. at 3.

**C. Ford Investigates the Functional Performance of the Released Radiators**

15. Ford, upon learning about the issue, tested 2000 and 2001 F-150 vehicles equipped with the cooling or the towing options. Id. at 3; see DFF ¶¶ 34-37; DFF, Ex. E (Declaration of Peter Kanefsky)("Kanefsky Decl.")) ¶¶4-5. Ford investigated whether 2000 and 2001 F-150 trucks with the towing and cooling options met performance requirements for "Super-Duty Engine Cooling" even though they had been built with the standard radiator and not the upgraded radiator. Id. Ford maintained that even without the upgraded radiator, "the cooling system in 2000 and 2001 F-150 vehicles fully meets and exceeds Ford's Super-Duty Engine Cooling specifications." Kanefsky Decl. ¶9.

16. After the testing was completed on October 27, 2000, and after a technical review meeting on November 2, 2000, Ford "determined that there was no engineering justification or

benefit to the customer to place a radiator with more cooling capacity than a 26 millimeter single row radiator [i.e., the "standard radiator"] in 2000 and 2001 F-150 vehicles with the [cooling option] or [towing option]." Id. ¶12.  The technical review committee "decided that since the released radiator met all the performance requirements of Super-Duty cooling it was unnecessary, from a functional perspective, to change the radiator either in production, or in any vehicle already built."  14D Report at 3.

17.  Ford maintains that Super-Duty Engine Cooling "is really about the performance of the vehicle, not necessarily what components are included on that vehicle."  Lenz. Dep. at 45. Ford's corporate designee, however, emphasizing that the 1.02" radiator met all functional requirements, acknowledged that the 1.42" radiator did produce different results than the 1.02" radiator, and that it, in particular, the 1.42" radiator kept the coolant temperature eight degrees cooler and the engine and transmission oil temperatures six degrees lower under certain conditions.  Id. at 45, 48-50.

18.  Ford's corporate designee, Mr. Lenz, testified in his deposition that the phrase "upgraded radiator" used in Ford's communications with dealers is ambiguous.  Id. at 29, 92-93. He testified, for example:

> The phrase upgraded radiator is really ambiguous.  It's a possible interpretation that that could mean a different piece of equipment, or it could mean something else entirely, but that's really the ambiguous phrasing that was present in some of our dealer communications.  Again, the dealer order guide, which is the document that contained the verbiage upgraded radiator is really a document that few customers are actually going to get a chance to see.
> That document is used for communications just strictly with our dealers, and it's possible that during the sales process – it's possible that during the sales process it could have been shown

> to a small number of customers, but really that would be the
> exception.  So the phrase upgraded radiator is really ambiguous, I
> think.

Id. at 29-30; see also  DFF, Ex. E. Tab G (Deposition of Mark Grueber) ("Grueber Dep.") at 28.

Mr. Lenz later added:

> It could be interpreted by some people to mean an additional or
> different piece of equipment, and it could be interpreted by some
> people to mean a change in specification.  It could be interpreted
> by any number of people in any number of different ways.  That's
> why I said ambiguous.

Id. at 92-93.  Ford through its corporate designee Mr. Lenz maintained that, although the towing

and cooling options were separate options with component MSRPs, "it's really impossible to

know what any customer paid for any individual option" because "it's a very common practice in

the sales process where our dealerships really negotiate the final price with the customer."  Id. at

33.  "Ford establish[ed] the suggested retail price, but the dealer again doing that individual

negotiation, the dealer could choose to say throw in that package [even for zero dollars] to close

the deal."  Id.

**D. Ford's Customer Satisfaction Program**

19. At the meeting in November 2000 and beyond, Ford considered customer satisfaction

responses.  Kanefsky Decl. ¶13.  In March 2001 there were an "extensive series of discussions

about a possible customer satisfaction program" in response to the radiator issue.  Id.

Ford conducted customer satisfaction surveys and determined that customers had different levels

of knowledge and concern about the radiator.  "Most customers were not aware of any radiator

issue," and customers had different preferences about what Ford should do to satisfy any

concerns.  Id. ¶14.  Ford ultimately designed and initiated a customer satisfaction program that

allowed certain affected F-150 customers to receive $100.00 cash, a $500 coupon toward the

purchase of a new Ford vehicle, or a free replacement radiator.   Id. ¶15.  Before this program

was initiated, warranty data showed that Ford had already paid to replace more than 200

radiators.  Id.

    20. During discussions about the customer satisfaction program, Pamela Fitzgerald of

Ford's F-150 Marketing Team wrote the following in an email entitled "RE: Suggestion for

wording of F150 Wrong Radiator - Customer Letter":

> Please do not explain this situation as a marketing literature error.
> The radiator was incorrectly released.  These vehicles . . . were in
> fact supposed to receive the upgraded radiator.  We did not false
> advertise, we mis-built.

Lenz. Dep., Ex. A10 ("Fitzgerald email").  Ms. Fitzgerald proposed a strategy for a customer

satisfaction program:

> In an attempt to move our efforts forward, I would like to obtain
> concurrence from everyone on the following offer to the
> customers:
> > Option #1: Check for $200 (This includes $100 they paid
> > for radiator upgrade and $100 goodwill)
> >
> > Option #2: Retro-fit the upgraded radiator.

Id.  This strategy was not adopted.  Instead, the  $100.00 cash, $500 coupon, or a free

replacement radiator strategy was adopted.  See Kanefsky Decl. ¶15.  Ford's corporate designee,

Mr. Lenz, testified in his deposition that the Fitzgeral email was the impression of one individual

early in the evaluation process, and that it was later determined by Ford engineering testing that

the vehicles were not misbuilt.  Lenz Dep. at 114-15.  Mr. Lenz went on to explain that "[t]he

1.02 inch radiator which was released by engineering for these vehicles was, in fact, built into the vehicles, and those vehicles do, in fact, exceed our super cooling performance specifications." Id. at 115.  He indicated his opinion that the statement in the Fitzgerald email – "[w]e did not false advertise, we mis-built" – was not correct.  Id.

21.  Ford initiated an owner notification program concerning the radiator situation as part of the customer satisfaction program, and sent out letters to original current owners or lessees of the 2000 and 2001 F-150 truck who had purchased their vehicles prior to May 5, 2001, the date on which Ford believed that it had removed the last reference to the upgraded radiator from its website.  Lenz. Dep. 68-70.  The record suggests that owner notification letters were sent out beginning in November 2001.  Id. at 73; see Castleberry Aff. ¶6.  Ford publicized these letters on its dealer databases.  Castleberry Aff. ¶3-5.  The customer letter offered owners the option of a $100.00 check, $500.00 discount, or installation of a 1.42" radiator to replace the 1.02" radiator. Lenz Dep. at 174-75.  Ford determined that over four- hundred-fifty thousand (457,117) 2000 and 2001 F-150 trucks were affected.  Lenz Dep., Ex. A18.[8]

22. Ford eliminated approximately 83,676 vehicles from this group due to (1) warranty start dates after May 5, 2001 (Ford's cutoff date based upon its removal of information from its dealer order websites) (55,577 vehicles); (2) vehicles still in dealers' stocks as of May 5, 2001 (13,355 vehicles); (3) vehicles that no longer belonged to the original owner (14, 540 vehicles); and (4) vehicles which were company cars (204 vehicles).  Id.; see Lenz Dep. at 190-94.  Ford did not mail owner notification letters to individuals whose warranty start dates came after May

---

[8]This document was produced by Ford subject to a protective order and filed under seal.

5, 2001, to individuals who purchased vehicles that were still in dealers' stocks as of May 5, 2001, to individuals who no longer owned their car, or to company owners.

23. Ford mailed 349,929 letters in the United States. Lenz Dep. at 178. 183,193 customers (79%) cashed checks for $100.00. Ex A17; Lenz Dep. at 179. 25,102 customers (11%) requested the $500.00 coupon or "owner loyalty certificate" ("OLC"). Ex A17; Lenz Dep. at 196. 22,523 customers (10%) requested to have the 1.42" radiator installed. Ex A17; Lenz Dep. at 198.

24. Ford mailed 8,457 letters in Pennsylvania. Ex. A17; Lenz Dep. at 173-74, 208-09. Of these, approximately 2100 letters[9] received no response. Ex. A17; Lenz Dep. at 208-09. Of the 6,286 responses to these letters from individuals in Pennsylvania, 4,914 (78%) chose the $100.00 check, 716 (11%) chose the $500.00 certificate, and 633 (10%) chose the radiator replacement. DFF, Ex. E., Tab K (Affidavit of Brett Castleberry) ("Castleberry Aff.") ¶6-7. Ford used a customer database (the "NAVIS database") and hired an outside company to generate the mailing list. Id. at 162-63.

**E. Internal Marketing and Pricing Documents**

25. Other Ford documents support plaintiff's position that Ford originally intended that the towing option and the cooling option were supposed to include an upgraded radiator. See PFF ¶¶16, 18-19 (citing Deposition of Todd Lenz, Ford's Corporate Designee and F-150 Marketing Manager ("Lenz Dep.") 123-25 and Ex. 12 thereto ("Ex. A12") ("Marketing and Sales

---

[9]It is difficult to read Ex. A17 due to the fine print. At the deposition, counsel and Mr. Lenz struggled to read this figure and determined that it likely was either 2100 or 2180. Lenz Dep. at 208-09.

Controller's Office: Super Engine Cooling (Radiator Upgrade)" form) (the "Radiator Upgrade form").[10]

26.  The Radiator Upgrade form, for example, indicated that $210.00 of the $350.00 MSRP for the Class III Trailer Towing Option was due to a "Heavy Duty Electrical/Cooling Group."  Ex. A12 (Radiator Upgrade form).  The form indicated that the Heavy Duty Electrical/Cooling Group included the "Super Engine Cooling (radiator upgrade)" which itself accounted for $98.00 of MSRP.  Id.; see also Lenz. Dep. at 123-27.  Plaintiff contends that this form is an internal pricing document which confirms that a portion of the MSRP for the towing option was attributable to the inclusion of the 1.42" thick radiator.  PFF ¶ 18.  Ford contends that the reference to an "upgraded radiator" in the dealer's order guide did not specify whether it meant a radiator with particular specifications or just one that allows the truck to meet Ford's Super Engine Cooling standard.  Lenz Dep. at 44-45; Grueber Dep. at 28.

**F. Communications with Dealers and Updating Website References to "Upgraded Radiators"**

27. Ford distributed an F-150 dealer ordering guide to dealers prior to the beginning of each model year.  Lenz Dep. at 41-42, 96-97.  The dealer order guide described the major standard equipment on the vehicle and various options which were available.  Lenz Dep., Ex. A7 ("2001 dealer order guide")[11]; see also Lenz Dep. at 91-94, 96-97.  The dealer order guide was given to dealers to inform them about the vehicles for the purpose of ordering the vehicles.  Lenz

---

[10] This document was produced by Ford subject to a protective order and filed under seal.

[11] This document was produced by Ford subject to a protective order and filed under seal.

Dep. at 91-92.  In addition, the Source Book, states "[u]se the F-150 information in this source book [sic] to enhance your sales presentations."  See id. at 106.

28. The 2001 F-150 dealer order guide described under "Group/Miscellaneous/Options" the towing and cooling options.   Lenz Dep., Ex. A7 at 8.  The 2001 dealer order guide indicated that the towing package ("Class III Trailer Tow Group (535)") included the cooling option ("Heavy Duty Electrical/Cooling Package (531)").  Id.  It further indicated that the cooling package included "Super engine cooling (radiator upgrade)."  Id.

29. On May 5, 2001, as previously noted, Ford removed the reference to an upgraded radiator from dealer order guides and removed documents that contained a reference to an upgraded radiator from their website for the distribution of dealer order guides.  Lenz Dep. at 70; 99 ("The last communication to our dealers that included the ambiguous language was May 5th. And in that testimony, I will include the website and the printed [order guides], to the best of my knowledge.").

30. In July 2001, Ford communicated with its dealers about the radiator issue via a "hot sheet."  Id. at 71-72, 95-96 ("The mass dealer communication that addressed the ambiguity of the language [concerning radiator upgrade] and detailed the facts about the situation, I would say, would be the hot sheet from July of 2001.").

31. Emails obtained from Ford personnel indicate that certain websites related to Ford may have contained references to the upgraded radiator beyond May 2001.  Lenz Dep. Ex. A5.[12] For example, an email sent August 9, 2001, from Gene Brown, F-150 Marketing Manager, to David Router, the owner of a related public affairs website stated:

---

[12]This document was produced by Ford subject to a protective order and filed under seal.

> I am told you own the site referenced below [media.ford.com (Public Affairs)], which contains an outdated reference to an upgraded radiator on certain F-150s.  This matter is causing legal concerns. . . . Can you assist us with getting it off your site?

Id. at 54.  Other related emails confirm that Ford was concerned that "there maybe [sic] multiple websites." Id. at 55 (August 9, 2001 Email from Ross Otter to Group); see id. at 56 (Email from Michael Kiselis to Group)( "I was looking at the F150 online website and the so called 'wrong radiator' site.  As of mid July, they are saying our websites still show upgraded radiators . . . [T]he only place an upgraded 'Super Cooling' radiator is listed is under package 531.  Correct me if I am wrong, but I thought we agreed to get rid of all mentions of Super cooling [sic] in the publications.").

32. Plaintiff challenges the adequacy of the May 5, 2001 cutoff date.  See, e.g., Lenz Dep. at 188; Lenz Dep., A12 at 9 (14D Report) ("No procedure exists for the management of electronic versions of sales and marketing literature."); see also Lenz Dep., A12 at 3 (14D Report) (noting advice from the Office of General Counsel ("OGC") to that effect that because the catalogs contained a standard disclaimer that "Ford Division reserves the right to change product specifications at any time without incurring obligations," no field action was taken although this advice was "based on printed versions of the marketing literature supplied to the OGC" and "[e]lectronic versions of these documents on the Ford web site and additional documents not reviewed by OGC did not carry the standard disclaimer.").

## G. Estimated Financial and Other Implications

33. Ford's internal confidential 14D Report initially estimated the financial implications of the radiator issue and ameliorative measures at a net cost to Ford of more than $24 million.

16

Lenz Dep., Ex. A12 at 8.  Ford's corporate designee indicated that the estimates overstated the actual cost because they did not take into account the actual owner notification program that was put in place and overestimated the number of people who would ask for a radiator upgrade to the 1.42" radiator.  Lenz Dep. at 158-59.

**H. Possible Agency Relationship Between Ford and Its Authorized Dealers**

34. The record suggests that Ford used somewhat standardized Sales and Service Agreements ("SSAs") with its authorized dealers.  Ford's corporate designee upon questioning about the SSA between Ford and Lake View Ford indicated that it appeared to be a standard form agreement but that he could not testify whether it was the only form used by Ford at the time.  Id. at 211-12.

35. According to deposition testimony,[13] the Lake View SSA and others were drafted by Ford.  See id. at 216.

36.  The SSAs provided, among other things, that the dealer shall promote the sale of Ford vehicles in accordance with Ford's instructions and provide Ford with records to that effect. See id. at 218-19. ("The dealer shall promote vigorously and aggressively the sale at retail of cars and trucks," "[t]he dealer shall, in accordance with company's instructions, complete, execute and deliver to each retail purchaser of a vehicle from him the company's then current publications for owners with respect to the operation, maintenance and warranty of the vehicle," and "[i]n furtherance of the mutual interest . . . the dealer shall furnish to the company each month at the time and on the forms prescribed by the company the complete statement reflecting

---

[13]The sales and service agreement does not appear in the evidentiary submissions to the court for the purpose of deciding the motion for class certification.

the true financial condition, and the month and year to date operating results of his dealership

operations as of the end of the preceding month.").

    37. The SSAs further provided that Ford retained control over prices, discounts and other

terms of sale.  <u>See id.</u> at 223.  ("Sales of company products by the company to the dealer

hereunder will be made in accordance with the prices, charges, discounts and other terms of sale

set forth in the price schedules, or other notices published by the company to the dealer from time

to time in accordance with the applicable vehicle terms of sale bulletin or parts and accessories

terms of sale bulletin.").

    38. Ford retained the ability under the agreements to examine the dealership facilities,

operation, stock of vehicles and equipment; to check and instruct the dealer and the dealer's

employees in the proper handling of warranty and other repairs and claims; and to examine, copy,

and audit any and all of the dealer's records and documents.  <u>See id.</u> at 228-29.

    39. The "Standard Terms and Conditions" listed in form Sales Agreement produced by

Lake View Ford indicated, <u>inter alia</u>, that:

> 1. . . . . (c) "Manufacturer" shall mean the Corporation that
> manufactured the vehicle or chassis, it being understood by Buyer
> and Dealer that <u>Dealer is in no respect the agent of Manufacturer</u>,
> and that reference to Manufacturer herein is for the purpose of
> explaining generally <u>certain contractual relationships</u> existing
> between Dealer, Owner, and Manufacturer with respect to new
> motor vehicles.

Reply Certification of Joseph Kravec (Doc. No. 45), Ex. C (emphasis added).  The terms and

conditions further established that

> 3. Manufacturer has reserved the right to change the design of any
> new motor vehicle, chassis, accessories or parts thereof previously
> purchased by or shipped to Dealer or being manufactured or sold in

18

accordance with Dealer's orders.  Correspondingly, in the event of
any such change by Manufacturer, Dealer shall have no obligation
to Buyer to make the same or any similar change in any motor
vehicle, chassis, accessories or parts thereof covered by this Order
either before or subsequent to delivery thereof to Buyer.

4. Dealer shall not be liable for failure to deliver or delay in
delivering the motor vehicle covered by this Order where such
failure or delay is due, in whole or in part, to any cause beyond the
control or without the fault or negligence of Dealer.

<u>Id.</u>

## III. CONCLUSIONS OF LAW

1.  To be certified, a class must satisfy the four requirements of Federal Rule of Civil
Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of
representation.  Fed.R.Civ.P. 23(a).  If the Rule 23(a) requirements are met, the court must then
find that the class fits within one of the three categories of class actions set forth in Federal Rule
of Civil Procedure 23(b).  <u>In Re Community Bank of Northern Virginia</u>, 418 F.3d 277, 302 (3d
Cir. 2005).  <u>See also Chiang v. Veneman</u>, 385 F.3d 256, 264 (3d Cir. 2004); <u>In Re LifeUSA</u>, 242
F.3d 136, 143 (3d Cir. 2001); <u>Georgine v. Amchem. Prods., Inc.</u>, 83 F.3d 610, 624 (3d Cir.
1996), <u>aff'd</u>. <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591 (1997); <u>Baby Neal v. Casey</u>, 43
F.3d 48, 55 (3d Cir. 1994).

2.  The proponent of class certification has the burden of proving each of the
prerequisites of a class action under Rule 23(a) and that the class fits within one of the three
categories of class actions set forth in Rule 23(b).  <u>Chiang</u>, 385 F.3d at 264.  The court notes,
however, that it is not necessary for plaintiff to establish the merits of his case at the certification
stage, and that in determining whether the class will be certified, the substantive allegations of

the complaint must be taken as true.  Chiang, 385 F.3d at 262 (citing Eisen v. Carlisle &
Jacquelin, 417 U.S. 156, 177-78 (1974)).  Indeed, the class certification inquiry cannot evolve
into a "preliminary inquiry into the merits."  Eisen, 417 U.S. at 177.

      3.    Although the court shall not determine the merits of plaintiff's claim, his claim must
be scrutinized in light of the factual record in order to determine whether it is suitable for
classwide adjudication.  See Johnston v. HBO Management Films, Inc., 265 F.3d 178, 189 (3d
Cir. 2001); see also Robinson v. Texas Auto Dealers Ass'n, 387 F.3d 416, 421 (5th Cir.
2004)("[W]e take care to inquire into the substance and structure of the underlying claims
without passing judgment on their merits. 'Although "the strength of a plaintiff's claim should
not affect the certification decision," the district court must look beyond the pleadings to
"understand the claims, defenses, relevant facts, and applicable substantive law in order to make
a meaningful determination of the certification issues."'")(quoting McManus v. Fleetwood
Enterprises, Inc., 320 F.3d 545, 548 (5th Cir. 2003)(quoting Castano v. Am. Tobacco Co., 84 F.3d
734, 740 (5th Cir.1996))).  Indeed, the United States Court of Appeals for the Third Circuit as a
matter of first impression recently held that, under the 2003 amendments to Rule 23, and in
particular due to the newly-created Subdivision (c)(1)(B), which provides in relevant part that
"[a]n order certifying a class action must define the class and the class claims, issues, or defenses
. . . .," that the plain text of the Subdivision, especially considered in light of parallel provisions
of the Rule, "requires district courts to include in class certification orders a clear and complete

summary of those claims, issues, or defenses subject to class treatment." <u>Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of America</u>, 453 F.3d 179, 184-85 (3d Cir. 2006).[14]

4.    In deciding a motion for class certification, the court must be satisfied "after a rigorous analysis" that all the requirements for class certification are met. <u>General Telephone Co. v. Falcon</u>, 457 U.S. 147, 160 (1982). As the United States Court of Appeals for the Third Circuit has recently made clear, failure to follow the procedures required before approving a class action is an abuse of discretion. <u>In Re Community Bank of Northern Virginia</u>, 418 F.3d 277 (3d Cir. 2005) (settlement-only class).

5.    The crux of plaintiff's breach of contract claim for which he seeks certification is that plaintiff, and other members of the putative class, purchased or leased a 2000 or 2001 model year F-150 truck from defendant Ford with either the towing option or cooling option. As part of these options, plaintiff argues that plaintiff and the other members of the putative class were charged extra for an upgraded radiator but that Ford gave them a standard radiator instead. As plaintiff views the situation: plaintiff and the putative class members paid for an upgraded radiator that they never received. Plaintiff argues that class certification is appropriate because the Rule 23(a) prerequisites of class certification are met, common issues of fact or law predominate, and the class action is the superior device for adjudicating the controversy.

6.    Defendant argues that class certification is not appropriate because the contract claim underlying this civil action is highly individualized and the predominance requirement

---

[14]The court of appeals arrived at this conclusion "primarily through textual analysis of Rule 23(c)(1)(B)," but noted that the substantive standard laid out by the decision also "comports with and facilitates compliance with the textual requirements and apparent purpose of other provisions of Rule 23" and "dovetails with the apparent purpose and goals of amending the Rule as expressed in the Advisory Committee Notes." <u>Id.</u> at 185-86 & n.6.

cannot be met, plaintiff is not an adequate class representative, and classwide adjudication is not superior to other methods for resolving the controversy.

  7. In light of the arguments raised by both parties, the issue of class certification in this case largely depends upon whether, as plaintiff argues, common issues of fact and law predominate, and the breach of contract claim at issue is based upon standardized form contracts or otherwise susceptible to generalized proof, or whether, as defendant argues, adjudication of the claim will involve highly individualized inquiries concerning liability, causation, and damages.

**A. Rule 23(a) Prerequisites to a Class Action**

  9. To be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  Fed.R.Civ.P. 23(a).  Rule 23(a) specifically provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

  10. The United States Court of Appeals for the Third Circuit Court has explained that the requirements of Rule 23(a) are meant to ensure that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances of a case.  Baby Neal, 43 F.3d at 55.  Numerosity addresses the first of these concerns (i.e., the necessity of class action treatment) while commonality, typicality, and adequacy address whether the class action can be maintained in a fair and efficient manner.  Id.

**1. Numerosity**

11.    Rule 23(a)'s numerosity requirement focuses on the necessity of class action treatment where the class is so numerous that joinder of all members is impracticable.  See Fed.R.Civ.P. 23(a).  The proposed class here consists of approximately 2100 claimants.  While no number definitively establishes numerosity, a class as large as this one is sufficiently numerous for joinder to be impracticable.  As the United States Court of Appeals for the Third Circuit has explained:

> On the subject of how many is enough, Professor Moore has written "While the attitude taken towards a given number may vary, each opinion reflects a practical judgment on the particular facts of the case. Thus no hard and fast number rule can or should be stated, since 'numerosity' is tied to 'impracticability' of joinder under the specific circumstances. Nevertheless, some general tendencies can be observed. While there are exceptions, numbers under twenty-one have generally been held to be too few. Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement."

Weiss v. York Hosp., 745 F.2d 786, 808 n.5 (3d Cir.1984) (citing 3B J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 23.05[1], at 23-150 (2d ed. 1982) (footnotes omitted)).  Defendant, as established at the hearing on the motion for class certification, does not contest that the proposed class meets the numerosity requirement.  The court determines that the joinder is sufficiently impracticable and the numerosity requirement is satisfied.  See id.

**2. Commonality**

12.     The commonality requirement set forth in Rule 23(a) is satisfied if the named plaintiff shares at least one question of fact or law with the grievances of the prospective class. Baby Neal, 43 F.3d at 56 (citations omitted).  As the United States Court of Appeals for the Third Circuit has noted, the commonality requirement "is not a high bar."  Chiang, 385 F.3d at 265; see also Baby Neal, 43 F.3d at 56 ("Because the requirement may be satisfied by a single common issue, it is easily met. . . .").  Furthermore "class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice."  Id. (emphasis in original) (citations omitted).

13.     Here, plaintiff alleges that the entire class paid for towing or cooling options on Ford F-150 trucks which should have included an upgraded radiator.  Plaintiff identifies several common issues of law or fact common to plaintiff and members of the putative class: (1) whether Ford sold and contracted F-150s with towing or cooling options as including an upgraded radiator; (2) whether plaintiff and putative class members were charged for the upgraded radiator; (3) whether Ford delivered F-150s with towing or cooling options with standard radiators; and (4) whether Ford's failure to provide an upgraded radiator resulted in a breach of its contractual duties to plaintiff and putative class members.  These issues satisfy the relatively low bar of commonality.  Defendant, in fact, does not directly contest commonality in its memorandum in opposition or in its proposed conclusions of law.  Defendant asserts, however, that plaintiff failed to show that common issues of fact or law predominate as required by Rule 23(b), largely because the alleged breach of contract claim underlying the lawsuit arguably requires highly individualized inquiry.  This court briefly addresses commonality here and will address predominance in more detail below.

24

14.     The court finds that the named plaintiff shares at least one question of fact or law with the grievances of the prospective class.  The court notes, in particular, that all class members purchased or leased Ford F-150 vehicles with the towing or cooling option which plaintiff maintains entitled them to an upgraded radiator.  It is therefore clear that at least one common issue binds the class members:  Did Ford breach a contractual duty when it did not provide vehicles with the upgraded radiator to customers who purchased vehicles with the towing and cooling options?  Upon this finding, the court holds that the commonality requirement of Rule 23(a) is met.

**3. Typicality**

15.     Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed.R.Civ.P. 23(a)(3).  It has been noted that "[t]he concepts of commonality and typicality are broadly defined and tend to merge" and both seek to assure that the interests of absentees will be fairly and adequately represented.  Baby Neal, 43 F.3d at 56 (citing 7A Charles A. Wright, et al., Federal Practice and Procedure § 1764, at 247 (1986)).  See also In Re Community Bank, 418 F.3d at 303.  Neither commonality nor typicality, however, mandates that all putative class members share identical claims.  In Re Community Bank, 418 F.3d at 303; Baby Neal, 43 F.3d at 56.

16.     Moreover, despite their similarity in seeking to protect the interests of absentees, commonality and typicality are distinct requirements.  Baby Neal, 43 F.3d at 56.  Where

commonality evaluates the sufficiency of the class, typicality evaluates the sufficiency of the named plaintiff.  Id. (citing Hassine v. Jeffes, 846 F.2d 169, 177 n.4 (3d Cir. 1988).[15]

17.   Typicality assesses whether the named plaintiff has incentives that are aligned with those of absent class members so as to assure that the absentees' interests will be fairly represented by the named plaintiff.  Baby Neal, 43 F.3d at 57.  In other words, "[t]he typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the named absentees."  Id. Typicality, it has been explained, entails an inquiry whether the named plaintiff's individual circumstances are markedly different, or the legal theory upon which the named plaintiff's claims are based is different from one upon which the claims of other class members will be based.  Id. (citing Hassine, 846 F.2d at 177; Eisenberg, 766 F.2d at 786).

18.   Inquiries related to typicality ask whether the plaintiff's individual circumstances are different from that of absentees and whether plaintiff's legal theory is different from that of absentees.  Yet, as the United States Court of Appeals for the Third Circuit explained with

---

[15]The court in Baby Neal noted further that:

We underscore at the outset that neither [typicality nor commonality] mandates that all putative class members share identical claims, and that factual differences among the claims of the putative class members do not defeat certification.

Id. at 56.  See also Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985) (certifying securities fraud class action despite differences in injuries); Troutman v. Cohen, 661 F.Supp. 802, 811 (E.D.Pa. 1987) (certifying subclass of 1,973 nursing home patients challenging reductions in levels of nursing care designations over commonality and typicality objections "because it is not the unique facts of the individual appeals which give rise to this action but rather the decision making process").

respect to typicality in <u>Baby Neal</u>, even claims marked by factual differences in injury, but in which the same course of conduct gives rise to claims based on the same legal theory, are not necessarily rendered atypical by virtue of those factual differences:

> Commentators have noted that cases challenging **the same unlawful conduct** which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement **irrespective of the varying fact patterns underlying the individual claims**. . . . Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold.
>
> [F]actual differences will not render a claim atypical if the claim arises from the **same event or practice or course of conduct** that gives rise to the claims of the class members, and if it is **based on the same legal theory**.. . . . Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories.  Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice. . . .

43 F.3d at 58 (internal citations and quotations omitted) (emphasis added).

19.   Here, plaintiff argues Rule 23(a)'s typicality requirement is satisfied for much the same reasons that the commonality requirement is satisfied: (1) the class definition identifies a group of Ford customers, including plaintiff, whose vehicles did not contain an upgraded radiator which arguably they paid for when they purchased towing and cooling options on their vehicles, and this conduct is at the heart of the merits of plaintiff's case; and (2) the class definition is limited to individuals whose factual circumstances, though potentially different in multiple respects, are similar to plaintiff's in that they all stand similarly before defendant as customers who purchased towing or cooling options and did not receive upgraded radiators.  Plaintiff argues, therefore, that plaintiff's incentives are appropriately aligned with putative class members.

27

20.    Defendant argues, to the contrary, that plaintiff is not typical of the class because he did not negotiate over the price of his truck, and this sets him apart from typical buyers, so that to generalize from his own experience "defies the realities of the haggling that ensures in the American market when one buys a vehicle." Robinson v. Texas Automobile Dealers Ass'n, 387 F.3d 416, 423 (5th Cir. 2004).[16]  Defendant also argues that because plaintiff received a $500.00 discount when he bought his F-150 and later sold his F-150 truck he is differently situated than other putative class members.  Finally, defendant argues in its opposition brief but not in its proposed conclusions of law that plaintiff's damages claim is entirely speculative by reason of plaintiff's vehicle never being damaged by the radiator and his not using his vehicle to tow anything.  While defendant identified some potential differences between plaintiff and putative class members, these differences are not enough, under the standard for typicality set forth in Baby Neal, 43 F.3d at 58, to defeat typicality.  Id. ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.. . . . Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories.").  Defendant's issues with respect to these and other differences are related, and better addressed, with respect to the predominance inquiry and

_____

[16]In Robinson, the United States Court of Appeals for the Fifth Circuit did not address the typicality inquiry, which was not contested.  Id. at 421.  The court of appeals, however, reversed the district court's conditional certification of a class of purchasers who paid a markup for vehicle inventory tax in that antitrust case.  The court of appeals found that (1) common issues did not predominate because proving one element of the antitrust claim in that case – antitrust injury – depended in part on whether a purchaser negotiated in a "top-line" or "bottom-line fashion," and this inquiry required individualized proof; and (2) the  district court improperly applied the parol evidence rule in a case where neither side disputed the terms or validity of the contracts at issue.  Id. at 424.

whether, in particular, adjudication of the claims would devolve into highly individualized inquiries.

21.    Here, the claim originates based upon an alleged harm that is common to the class. Both plaintiff and the members of the putative class, taking as true the substantive allegations of the complaint, were subject to the same course of conduct by defendant that gives rise to claims based upon the same legal theory.  See Chiang, 385 F.3d at 262 (substantive allegations of the complaint are taken as true for purposes of deciding the class certification motion); see also Baby Neal, 43 F.3d at 58 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.").  Both plaintiff and the members of the putative class were allegedly charged for an upgraded radiator that they never received.  The typicality requirement of Rule 23(a)(3), therefore, is satisfied in this case.

**4. Adequacy**

22.    Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed.R.Civ.P. 23(a)(4).  The adequacy requirement, thus, addresses the sufficiency of the named plaintiff.  As the United States Court of Appeals for the Third Circuit explained, "[a]dequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class."  Baby Neal, 43 F.3d at 55.

23.    The adequacy requirement "encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees,' and it tests the qualifications of the counsel to represent

the class.'"  In Re Community Bank, 418 F.3d at 303 (3d Cir. 2005) (quoting In Re Gen. Motors

Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995) ("G.M.

Trucks")).

24.    The court notes, as an initial matter, that plaintiff has the burden of proving that the

prerequisites for a class action are met, and the initial burden to adduce evidence to support a

finding that he will fairly and adequately protect the interests of the class.  As to adequacy,

however, "in most cases, adequate representation presumptions are usually invoked in the

absence of contrary evidence by the party opposing the class."  ALBA CONTE & HERBERT

NEWBERG, NEWBERG ON CLASS ACTIONS § 7:24 (4th ed. 2002).  Specifically,

> [o]n the issue of no conflict with the class, one of the tests for adequate
> representation, the presumption fairly arises because of the difficulty of proving
> negative facts.  On the issue of professional competence of counsel for the class
> representative, the presumption fairly arises that all members of the bar in good
> standing are competent.  Finally, on the issue of intent to prosecute the litigation
> vigorously, the favorable presumption arises because the test involves future
> conduct of persons, which cannot be prejudged adversely.

Id. (citations omitted). Further,

> **[i]f there are any doubts about adequate representation or potential conflicts,
> they should be resolved in favor of upholding the class, subject to later
> possible reconsideration**, or subclasses might be created initially.  Alternatively,
> notice should be sent to the class inviting others to come in as additional class
> representatives.

Id. (citations omitted) (emphasis added).

25.    As to sufficiency of the named plaintiff, defendant argues that for the same reasons

that plaintiff is not typical, plaintiff is not adequate.  The court, however, found these arguments

unavailing as to typicality and finds them similarly unavailing as to adequacy.  None of the issues

identified by defendant cast into doubt whether the named plaintiff's interests are sufficiently

aligned with the absentees or whether his interests are antagonistic to the absentees.  In addition, there is no indication in the record that the named plaintiff with the help of his counsel will not vigorously prosecute this civil action if it is certified.  See also Zeno Dep. at 57 ("I would like to see that all owners of 2001 or [2000] (sic) Ford Pickup F-150 with a trailer towing package be made aware of what they did not receive, but paid for, and I would like to see the Court make restitution to those people.").  The court, therefore, finds plaintiff to be an adequate class representative.

26.    As to sufficiency of named class counsel, defendant does not challenge in its brief or proposed conclusions of law the competence or experience of plaintiff's counsel.  Plaintiff has attached as exhibits to the motion for class certification the biographies of proposed class counsel in this action.  Pl.'s Mot., Ex. C, D.  These biographies indicate that plaintiff's counsel of record, Joseph N. Kravec, Jr. of Specter, Specter, Evans & Manogue and Bruce D. Greenberg of Lite DePalma, Greenberg & Rivas, as well as their firms, have significant experience litigating class actions and have been found adequate by other courts.  See Vacarello v. Massachusetts Mutual Life Ins. Co., 226 F.R.D. 207, 233 (D.N.J. 2005); In re Metropolitan Life Ins. Co. Sales Practices Litigation, No. 06-00051, 1999 WL 33957871, at *21 (W.D.Pa. Dec. 28, 1999).  In addition, plaintiff's counsel have provided diligent and competent representation in the above-captioned case during the proceedings thus far.  The court, therefore, finds plaintiff's counsel Mr. Kravec and Mr. Greenberg to be adequate class counsel.

27.    Given the reasons set forth above, the adequacy requirement of Rule 23(a) is satisfied in this case.

**B. Certification of a Class Action Pursuant to Rule 23(b)(3)**

28.     In deciding a motion for class certification, if the Rule 23(a) requirements are met,

the court must then find whether the class fits within one of the three categories of class actions

set forth in Federal Rule of Civil Procedure 23(b).  In Re Community Bank, 418 F.3d at 302;

Chiang, 385 F.3d at 264; In Re LifeUSA, 242 F.3d at 143; Baby Neal, 43 F.3d at 55.

29.     Plaintiff in this civil action invokes Rule 23(b)(3), which provides:

> An action may be maintained as a class action if the prerequisites
> of [Rule 23(a)] are satisfied, and in addition:
>       . . .
>  (3) the court finds that the questions of law or fact common to the
> members of the class predominate over any questions affecting
> only individual members, and that a class action is superior to other
> available methods for the fair and efficient adjudication of the
> controversy. The matters pertinent to the findings include: (A) the
> interest of members of the class in individually controlling the
> prosecution or defense of separate actions; (B) the extent and
> nature of any litigation concerning the controversy already
> commenced by or against members of the class; (C) the desirability
> or undesirability of concentrating the litigation of the claims in the
> particular forum; (D) the difficulties likely to be encountered in the
> management of a class action.

Fed.R.Civ.P. 23(b)(3).  The court notes that whether certification is appropriate in this case, as in

many Rule 23(b)(3) cases, largely turns on the predominance and superiority inquiries.  The court

addresses these issues in turn.

**1. Whether Common Questions of Fact or Law Predominate Over Individual Questions**

30.     The predominance inquiry focuses on whether the proposed class is sufficiently

cohesive to warrant adjudication by representation.  In Re Community Bank, 418 F.3d at 308-09.

"A proper predominance inquiry 'trains on the legal or factual questions that qualify each

member's case as a genuine controversy, questions that preexist any settlement.'" Id. (quoting

Amchem, 521 U.S. at 623-24).   In this vein, the predominance inquiry is related to, but more strenuous than, the commonality requirement set forth in Rule 23(a).  Chiang, 385 F.3d at 273 ("[B]ecause the Rule 23(b)(3) predominance requirements incorporate the commonality requirement of 23(a), it is possible that 'even if Rule 23(a)'s commonality requirement is satisfied. . . the predominance criterion is far more demanding.'") (quoting Amchem, 521 U.S. at 623-24).  The predominance requirement is that "the common issues must constitute a 'significant part' of the individual cases." Id. (citations omitted).  The predominance requirement's relation to Rule 23(a)'s typicality requirement has been noted as well.  See In Re Community Bank, 418 F.3d at 308-09 ("[A] predominance analysis 'is similar to the requirement of Rule 23(a)(3) that claims or defenses of the named representative must be 'typical of the claims [or] defenses of the class.'") (quoting Amchem, 521 U.S. at 623-24).

31.    Plaintiff maintains that common questions of law or fact will predominate over individual issues because the complaint alleges and the evidence adduced thus far confirms that the contracts at issue are standardized and that defendant is liable for the same breach for each member of the class.  Plaintiff argues that Ford's conduct – (1) charging plaintiff and members of the putative class for options which, plaintiff alleges, should have included an upgraded radiator; and then (2) failing to provide an upgraded radiator –  forms the common nucleus of fact and law upon which plaintiff's breach of contract claim, and the putative class members claims, are based.  Plaintiff argues that courts routinely certify claims for breach of standardized contracts which involve a common course of conduct alleged to constitute a breach.  Plaintiff relies upon,

among others, <u>Allapattah Services, Inc. v. Exxon Corp.</u>, 333 F.3d 1248, 1261 (11th Cir. 2003);[17]

<u>Smilow v. Southwestern Bell Mobile Systems</u>, 323 F.3d 32, 39-42 (1st Cir. 2003);[18] <u>Steinberg v.</u>

<u>Nationwide Mutual Insurance Co.</u>, 324 F.R.D. 67, 79 (E.D. N.Y. 2004)[19]; <u>Winkler v. DTE, Inc.</u>,

_____

[17]In <u>Allahpattah</u>, the United States Court of Appeals for the Eleventh Circuit upheld class certification for purposes of determining liability in a case brought by gasoline dealers against their gasoline supplier alleging breach of contract.  The court of appeals upheld certification because there existed a common question whether the gasoline supplier breached a standard contract:

> We find that Exxon's argument that each breach of contract claim raised an individual issue is without merit. Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole. Whether it breached that obligation was a question common to the class and the issue of liability was appropriately determined on a class-wide basis.

333 F.3d at 1261.  In addition, the court upheld the finding that common issues predominated and the common issues were susceptible to generalized proof because all of the dealer agreements at issue in the case were materially similar and because the district court correctly concluded that the dealers could use extrinsic evidence to explain the nature of the gasoline supplier's good faith obligations to the dealers.  <u>Id.</u> at 1262.

[18]In <u>Smilow</u>, the United States Court of Appeals for the First Circuit reversed the decision of the district court to decertify a class action on behalf of wireless telephone customers for breach of contract and state and federal telecommunications acts.  323 F.3d at 39-41.  The court of appeals determined that the "common factual basis is found in the terms of the contract, which are identical for all class members" and the "common question of law is whether those terms precluded defendant from charging for incoming calls."  <u>Id.</u> at 39.  The court of appeals further noted that "individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3) [and] [w]here, as here, common question predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."  <u>Id.</u> at 40.

[19]<u>Steinberg</u> is discussed in more detail <u>supra</u>.

205 F.R.D. 235, 243 (D. Az. 2001);[20] and <u>Kliener v. First National Bank of Atlanta</u>, 97 F.R.D. 683, 692 (N.D. Ga. 1983).[21]  Plaintiff identifies a key inquiry in many of these decisions, and here:

> There is no definitive test for determining whether common issues predominate[;] however, in general, predominance is met "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position."

<u>In re Vitamins Antitrust Litigation</u>, 209 F.R.D. 251, 262 (D. D.C. 2002) (quoting <u>In re Potash Antitrust Litigation</u>, 159 F.R.D. 682, 693 (D.Minn. 1995)); <u>see</u> <u>Allapattah Services</u>, 333 F.3d at 1260-61 (quoting <u>In re Vitamins Antitrust Litigation</u>, 209 F.R.D. at 262).  Plaintiff argues that the alleged breach of contract in this case is susceptible of generalized proof.  Plaintiff argues that the contracts at issue are evidenced by the window sticker for each vehicle which shows, among other things, the VIN for the vehicle and the options on the vehicle.  Although the window sticker does not explicitly reference an "upgraded radiator," plaintiff argues that the terms "Trailer Towing Group, Class III" and "Heavy/Duty Electrical Cooling Group" are sufficiently ambiguous that parol evidence is admissible to explain or clarify these terms.  In addition, plaintiff argues that substantially uniform documents could be used to establish the meaning of each option package and that the window sticker and other evidence could support a

---

[20] "The [plaintiff purchasers of vehicles]'s breach of contract claim also presents a common issue because it requires an interpretation of the terms in the standard sales contract executed by [defendant] and each class member."  <u>Id.</u> at 240.

[21] "When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such."  <u>Id.</u> at 692.

breach of contract claim.  Plaintiff argues that, contrary to defendant's assertions, the evidence does not require individualized inquiries, but rather all of the evidence is from defendant's own books and records.  Plaintiff argues that 1) the affirmative defenses asserted in the answer further establish predominance of common issues; 2) causation and reliance do not weigh against certification because the former is susceptible to classwide proof and the latter is not at issue in this case; and 3) individual calculation of damages, if required, does not defeat certification.

32.   Defendant first argues that common issues do not predominate over individual issues because the controlling factual issues underlying the breach of contract claim are highly individualized – in large part because defendant argues that each putative class member's claim is based upon a unique contract comprising terms that were negotiated, offered, and accepted when an individual customer met with or spoke to various salespersons at various Ford dealerships.  That is, defendant argues that if the window sticker is the basis for plaintiff's claim that standard contracts existed between defendant and the putative class members, extraneous evidence would be necessary to support his claim that there is a contract term that promised buyers a specific radiator, and that this extraneous evidence would include inquiries whether a "radiator upgrade" formed the "basis of the bargain" for any particular purchase and whether that purchaser paid anything for the option package.  Defendant argues that certification must be denied because the terms of each putative class member's contract will have to be proven, and claims based upon individual contract negotiations or terms are unsuitable for class certification. Defendant relies upon Ritti v. U-Haul International, Inc., No. 05-4182, 2006 WL 1117878 (E.D.

Pa. Apr. 26, 2006),[22] <u>Carpenter v. BMW of North America</u>, No. 99-214, 1999 U.S. Dist. LEXIS

9272 (E.D. Pa. June 21 1999), <u>Adams v. Kansas City Life Ins. Co.</u>, 192 F.R.D. 274, 282 (W.D.

Mo. 2000), and <u>Williamson v. Sanofi Winthrop Pharms., Inc.</u>, 60 S.W.3d 428, 435 (Ark. 2001)

to this effect.  Second, defendant argues that because independent dealerships are free to develop

their own sales presentations and to undertake their own negotiations with prospective

purchasers, class certification is inappropriate because the basis of the bargain, and hence,

defendant argues, the terms of the contract, will vary for each putative class member. Third,

defendant argues that the breach of contract claim also requires a showing of damages, damages

would require extensive, individualized determinations, and certification, therefore, is

inappropriate.  Fourth, defendant argues that causation similarly would require extensive

individual assessments.  Fifth, defendant argues that whether there is privity of contract between

putative class members and Ford, and the related question whether authorized dealerships are

acting as Ford's agent when they sell vehicles to consumers, also require individualized proof.

33.    The court will examine the issues raised by the parties in a structured discussion of

the underlying claim in light of the factual record before the court.  <u>See</u> <u>Johnston v. HBO</u>

<u>Management Films, Inc.</u>, 265 F.3d 178, 189 (3d Cir. 2001)(the court in deciding certification

must scrutinize the claims in light of the factual record); <u>see also Robinson v. Texas Auto</u>

---

[22]In <u>Ritti</u>, the district court declined to certify a class of rental customers who reserved
trucks or trailers for specific dates, received confirmations, and did not receive trucks or trailers
on those specific dates. Id. at *1.  The court declined to certify the class because the court found
that each rental contract was a unique contract comprising terms offered and accepted based upon
oral, written, or electronic communications dealers and because the claims triggered different
defenses. <u>Id.</u>  Although the court found that plaintiff had met the commonality requirement, the
court found that plaintiff could not meet the typicality requirement and the predominance
requirement because the contracts at issue were unique. <u>Id.</u> at *6-9.

Dealers Ass'n, 387 F.3d 416, 421 (5th Cir. 2004)(the court must inquire into the substance and structure of the underlying claims without passing judgment on their merits and must look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues).

**(a) Breach of Contract**

34.     Plaintiff's complaint alleges a single claim of breach of contract.  A plaintiff asserting a breach of contract claim under Pennsylvania law must "establish [three] elements: '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super.Ct. 1999). The court will not make any findings on the merits of plaintiff's breach of contract claim at this time.  The court, however, must examine whether certification is appropriate in light of the elements of this claim and affirmative defenses to it in order to determine the predominance inquiry.[23]

**(i) Existence of a Contract**

35.     Plaintiff maintains that contractual obligations exist between defendant Ford, the manufacturer of the F-150 vehicles, and plaintiff and other putative class members, customers who purchased them, pointing to the window sticker and other extrinsic evidence as proof that plaintiff and other putative class members were entitled to an ungraded radiator from

_____

[23]At the outset, it is important to note that this case does not involve fraudulent or negligent misrepresentations claims.  Defendant's reliance on decisions involving negligent misrepresentation claims such as Johnston v. HBO Film Management, 265 F.3d 178 (3d Cir. 2001) (class certification not appropriate in RICO action based upon securities fraud in the form of oral misrepresentations as predicate acts), is unavailing.

manufacturer Ford.  In support of this argument, plaintiff argues that there is contractual privity between Ford and individual purchasers and, in the alternative, an agency relationship between Ford and its authorized dealerships can be proven using generalized proof.  Defendant contests that the window sticker is a contract, contests that Ford was a party to the contract entered into by individual purchasers like plaintiff and other putative class members with authorized dealerships, and contests that there is an agency relationship between Ford and its authorized dealers with respect to the sale of vehicles.  Defendant additionally contests that plaintiff can rely upon extrinsic evidence without resorting to individualized proof.

### (A) Privity and Agency

36.    Traditionally, a person or entity did not become liable for a breach of contract when that person or entity was not a party to the contract.  See Travelers Indemnity Co. v. Mahiai, 2005 WL 4122388, at *5 (Pa.Com.Pl. 2005) (quoting Evans v. Otis Elevator Co., 168 A.2d 573, 575 (Pa. 1961)).

> "When there has been no direct transaction between the plaintiff and the defendant, it is usually expressed by saying that they are not in 'privity' of contract. Privity of contract exists when there is a connection or relationship which exists between two or more contracting parties."

Id. (quoting Global Payments Direct v. EVS Holding Co., No. 1373, 2005 WL 2100102, at *13 (Pa. Com. Pl. 2005)).[24]  "In other words, '[f]or parties to be considered to be in privity, a

---

[24] See generally Williams v. West Penn Power Co., 467 A.2d 811, 814-18 (Pa. 1983)(discussing and expressing disapproval for the concepts of horizontal and vertical privity in the context of breach of express warranty and products liability area).  In Williams the court noted:

> "Privity of Contract.  That connection or relationship which exists between two or more contracting parties.  It was traditionally

contractual relationship must exist between them.'" Travelers Indemnity, 2005 WL 4122388, at

*5 (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1006 (Pa. 2003)).  See Deynzer v.

Columbia Gas of Pennsylvania, Inc., 875 A.2d 298, 301 (Pa. Super. Ct. 2005)("[P]rivity of

contract is *personal* privity, and is confined to the *persons* of the contracting parties.")(emphasis

in original).  The requirement of privity, however, has been abolished with respect to certain

kinds of causes of action which involve, among other things, statutory breach of warranty and

strict liability.  See, e.g., Hammond v. International Harvester Co., 691 F.2d 646, 649 (3d Cir.

1982);[25] Hahn v. Atlantic Richfield Co., 625 F.2d 1095, 1102 (3d Cir. 1980);[26] see generally

BLACK'S LAW DICTIONARY 1199 (rev. 6th ed. 1990).

---

> essential to the maintenance of an action on any contract that there
> should subsist such privity between the plaintiff and defendant in
> respect of the matter sued on."  BLACK'S LAW DICTIONARY 1079
> (rev. 5th ed. 1979).  "[W]hen there has been no direct transaction
> between the plaintiff and the defendant, [it] is usually expressed by
> saying that they are not in 'privity' of contract."  WILLIAM L.
> PROSSER, LAW OF TORTS 622 (4th ed. 1971)

Id. at 814 n.11.

[25]In Hammond, the court of appeals noted that in Salvador v. Atlantic Steel Boiler Co.,
319 A.2d 903 (Pa. 1974), the Pennsylvania Supreme Court permitted an employee injured when
a defective steam boiler purchased by his employer exploded to proceed against the manufacturer
of the boiler.  Hammond, 691 F.2d at 649.  "Salvador abolished Pennsylvania's horizontal privity
requirement [recognizing that a manufacturer is effectively the guarantor of his products' safety]
which had prevented ultimate consumers injured by a defective product from recovering against a
manufacturer with whom they had no contractual relationship." Id.

[26]In Hahn, the court of appeals discussed the decline of the formalistic requirement of
privity, noting, among other things, that the Pennsylvania Supreme Court in Kassab v. Central
Soya, 246 A.2d 848 (Pa. 1968), abolished the need to allege vertical privity in implied warranty
cases.  Hahn, 625 F.2d at 1102.

37.    Even if contractual privity is required, an agency relationship can establish an exception to the general requirement of privity.  See Travelers Indemnity, 2005 WL 4122388, at *5; see also Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980) (explaining the basic elements of agency).

38.    "The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" Scott, 415 A.2d at 60 (quoting RESTATEMENT (SECOND) OF AGENCY § 1, cmt. b (1958))(citing Chalupiak v. Stahlman, 81 A.2d 577, 580 (Pa. 1951)). "The burden of establishing agency rests upon the party asserting it." Id. at 62 n.8 (citing Girard Trust Bank v. Sweeny, 231 A.2d 407 (Pa. 1967)). "It is not necessary, however, to furnish direct evidence of the specific authority if it can be reasonably inferred from the circumstances of the case, Yezbak v. Croce, 88 A.2d 80, 82 (Pa. 1952), such as the relation of the parties to each other and their conduct with reference to the subject matter of the contract, Croft v. Malli, 105 A.2d 372, 376 (Pa. 1954), that there was at least an implied intention to create the relationship of principal and agent." Id. (citing Brock v. Real Estate Land Title & Trust Co., 178 A. 146, 148-50 (Pa. 1935)).

39.    The court declines to make any determination concerning the meritoriousness or lack thereof of plaintiff's breach of contract claim, including any determination whether plaintiff will be required to establish contractual privity or, in the alternative, an agency relationship, in order to establish the breach of contract at issue in this case.[27]  It is enough that the parties raise

---

[27]If this issue is briefed again by the parties, the court requests that the parties clarify the distinction between, on the one hand,  contractual privity *simpliciter*, and on the other hand, an agency relationship.  Discussion of these issues has been somewhat conflated in the admittedly

the issues of privity and agency and dispute them for the court to examine whether the issues and the dispute over them in the context of the factual record of this case are susceptible of generalized proof.  The court determines that – whether relevant, necessary, successful or unsuccessful – the dispute over privity and agency in this case, in the context of the factual record before the court and as briefed by the parties, is susceptible to generalized proof.

40.    Concerning agency, plaintiff alleges an agency relationship between Ford and its authorized dealerships with respect to one aspect of the sale and delivery of vehicles manufactured by Ford and sold and delivered by the dealership – the obligation to sell and

---

preliminary briefing on the issues up to this point.

      Going forward, the court would request that the parties clearly delineate the bases for their arguments concerning contractual privity and agency.  The parties do not explicitly address whether contractual privity can be proved or disproved independent of any agency relationship that can be proved or disproved.  The court notes, for example, that the purchase agreement for plaintiff's vehicle which was signed by plaintiff and an authorized representative of plaintiff's dealership, Lake View Ford, and which is part of the factual record before the court, contemplates some contractual obligations on the parts of "Manufacturer," "Dealer," and "Buyer."  See DFF, Ex. F (one-page purchase agreement between Lake View Ford and plaintiff); compare Plaintiff's March 15, 2006 Reply Certification In Support of Class Certification ("Pl.'s March 15 Reply Cert."), Ex. C (an apparently two-page blank purchase agreement used by Lake View Ford) (Doc. No. 45).  The purchase agreement shows both Lake View Ford and Ford's logos.  Lake View Ford and the individual purchaser, however, are the only signatories to the agreement.  It is unclear whether the second page is part of the same form from the record.  The second page lists "Standard Terms and Conditions" which include definitions for "Manufacturer," "Dealer," and "Buyer," including the provision that "'Manufacturer' shall mean the Corporation that manufactured the vehicle. . . , it being understood by Buyer and Dealer that Dealer is in no respect the agent of Manufacturer, and that reference to Manufacturer herein is for the purpose of explaining generally certain contractual relationships existing between Dealer, Owner, and Manufacturer."  Id. at 2 ("LAKE VIEW 0003).  The conditions contemplate other contractual obligations including, but not limited to, that "Dealer shall not be liable for failure to deliver or delay in delivering the motor vehicle covered by this Order where such failure or delay is due, in whole or in part, to any cause beyond the control or without the fault or negligence of the Dealer."  Id.  The parties should address going forward whether this standard document, and other evidence, could be used prove or disprove some form of contractual privity with respect to the Buyer/Owner, Dealer, and Manufacturer.

42

deliver the vehicle with the options listed on the window sticker.  This obligation is arguably one

that could be shared in whole or in part by the manufacturer and the dealership. While Ford

argues that there is legal authority to the effect that manufacturers of automobiles have been

determined by courts not to be in an agency relationship with their dealerships concerning the

sale of vehicles, the contractual obligation being litigated in this case is not whether Ford was the

dealer's principal for the sale and delivery of the vehicle broadly construed, but whether Ford

was the dealer's principal concerning the more narrow purpose of delivering a vehicle with the

options, and perhaps all component parts included in the options, listed or indicated on the

window sticker for a particular vehicle traceable by VIN.

      41.    Plaintiff argues that evidence of agency between Ford and its authorized dealers,

including evidence specifically addressing the inclusion of an upgraded radiator in the towing

and cooling package options, can be adduced from a standard form Sales and Service Agreement

("SSA"), other common proof, and a common course of conduct.   Plaintiff argues that there is

no need for individualized inquiry concerning individual Ford dealers other than obtaining

common records that Ford receives from its dealers in the normal course of business.

Specifically, plaintiff argues that the evidence shows Ford makes its dealers authorized Ford

dealers and enters into a SSA with them, which is a standard form document.  The SSA expressly

provides that "[t]he dealer shall, in accordance with the company's instructions, complete,

execute and deliver to each retail purchaser of a vehicle from him the company's [i.e., Ford's]

then current publications for owners with respect to the operation, maintenance and warranty of

the vehicle." See Lenz Dep. at 217.   In addition, Ford distributed a dealer order guide to dealers

at the beginning of the model year as part of the Source Book and the Source Book expressly

directed Ford dealers to use it "to describe the capabilities and features of the vehicle" to persons purchasing F-150 trucks.  Plaintiff points out that it was this dealer order guide that described the towing options at issue as including "super engine cooling (radiator upgrade)." Id. at 92, Ex. A7. Further, plaintiff points out that Ford had its dealers deliver to consumers and maintain a dealer copy of the Window Sticker that Ford affixed to each F-150 vehicle identifying the name and list price of the towing options; that the standard SSA requires its authorized dealers to provide Ford with regular sales reports showing each vehicle sold or leased and the details of the sale or lease; and Ford has the right under the SSA to audit, examine and copy all dealer records and documents, including sales documents, which Ford does from time to time.

42.     Ford's reliance on decisions that denied class certification based upon individual determinations concerning an agency relationship or relationships is unavailing because these cases are readily distinguishable from this case.  See, e.g., Mack v. General Motors Acceptance Corp., 169 F.R.D. 671, 678 (M.D.Ala. 1996) (plaintiff's agency theory at the heart of breach of contract and fiduciary duty claims related to financing and required individual determinations because it was the dealer, and not the defendant automobile financing company, that undertook the duty of procuring financing); O'Brien v. J.I. Kislak Mortgage Corp., 934 F.Supp. 1348, 1358 (S.D.Fl. 1996)(finding that establishing an agency relationship in the context of a Truth in Lending Act civil action would require individualized legal analysis of thousands of loan transactions).  Here, the agency theory advanced by plaintiff and disputed by defendant can be proved or disproved by reference to and interpretation of standard form documents.  If upon a review of the merits the forms and documents are not similar or individual inquiry becomes necessary, the court, at that time will consider decertifying the class.

### (B) The Parol Evidence Rule

43.   The parol evidence rule has been explained by Supreme Court of Pennsylvania as follows:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract. . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004) (quoting Gianni v. Russell & Co., 312 A. 791, 792 (Pa. 1924)) (citations omitted).  "[F]or the parole evidence rule to apply, there must be a writing that represents the 'entire contract between the parties.'" Id. (quoting Gianni, 312 A. at 792).

44.   "To determine whether or not a writing is the parties' entire contract, the writing must be looked at and 'if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties. . . .'"  Id. (quoting Gianni, 312 A. at 792).[28]

---

[28]"An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." Yocca, 854 A.2d at 436 (citing HCB Contractors v. Liberty Place Hotel Associates, 652 A.2d 1278, 1280 (Pa. 1995); McGuire v. Schneider, 534 A.2d 115, 117 (Pa. Super. Ct. 1987), aff'd, 548 A.2d 1223 (Pa. 1988)).

45.    "Once a writing is determined to be the parties' entire contract, the parol evidence

rule applies and evidence of any previous oral or written negotiations or agreements involving

the same subject matter as the contract is almost always inadmissible to explain or vary the terms

of the contract.  Id. at 436-37 (citing Bardwell v. Willis Co., 100 A.2d 102, 104 (Pa. 1953);

McGuire v. Schneider, 534 A.2d 115, 117-18 (Pa. Super. Ct. 1987)).

46.    There, however, are exceptions to this general rule.  One exception is that "parol

evidence may be introduced to vary a writing meant to be the parties' entire contract where a

party avers that a term was omitted from the contract because of fraud, accident, or mistake."  Id.

(citations omitted).  "In addition, where a term in the parties' contract is ambiguous, 'parol

evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the

ambiguity is created by the language of the instrument or by extrinsic or collateral

circumstances.'"  Id. (quoting Estate of Herr, 161 A.2d 32, 34 (Pa. 1960)).

47.    In this case, if the court is required to reach the merits of the breach of contract

claim, the court could find either that (1) the parol evidence rule does not apply because the

averred contractual obligations underlying plaintiff's breach of contract claim are not set forth in

a single "writing that represents the 'entire contract between the parties,'" Yocca, 854 A.2d at

436 (quoting Gianni, 312 A. at 792);[29] or (2) even if the parol evidence rule were to apply, the

court could find the parties' "contract" ambiguous, and in such cases "'parol evidence is

admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is

---

[29] See RESTATEMENT (SECOND) CONTRACTS § 209(2) ("Integrated Agreements") at 115
("Whether there is an integrated agreement is to be determined by the court as a question
preliminary to determination of a question of interpretation or to the application of the parol
evidence rule.").

46

created by the language of the instrument or by extrinsic or collateral circumstances.'" <u>Yocca</u>, 854 A.2d at 437 (quoting <u>Estate of Herr</u>, 161 A.2d 32, 34 (Pa. 1960)).[30]   The mere fact that plaintiff and defendant might need to resort to parol evidence to prove or defend against plaintiff's claim does not in itself create a problem for the predominance requirement when the extrinsic evidence at issue is common among the class to the extent that it consists of standardized forms and other forms of proof generally applicable to the entire class.

### (C) Generalized Proof of the Existence of a Contract

48.    While the court is not certain whether plaintiff ultimately can prevail in proving that either there is contractual privity between Ford and individual purchasers through the window sticker, standard sales agreement used by dealerships, and other extrinsic evidence, or whether plaintiff ultimately can prevail in proving an agency relationship between Ford and its authorized dealers, the court finds that plaintiff's theory of the contractual obligations at issue – as well as defendant's affirmative defenses – both are susceptible of generalized proof.

### (ii) Individual Inquiry Concerning Causation and Damages

49.    For many of the same reasons set forth above, and based upon the claims and the factual record of this case, the court finds that some individualized inquiry may be required with

---

[30] <u>See</u> <u>In re Montgomery Ward & Co., Inc.</u>, 428 F.3d 154, 161 (3d Cir. 2005).  It is a question of law whether an agreement is ambiguous.  <u>Id.</u>; <u>see</u> <u>Canal Ins. Co. v. Underwriters at Lloyd's London</u>, 435 F.3d 431, 435 (3d Cir. 2006)("Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'")(quoting <u>Hutchison v. Sunbeam Coal Co.</u>, 519 A.2d 385, 390 (Pa. 1986)).  "This is not a question to be resolved in a vacuum.  Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts."  <u>Id.</u> (internal quotations and citation omitted).  If an agreement is unambiguous, the court can declare its meaning as a matter of law.  <u>In re Montgomery Ward</u>, 428 F.3d at 161.  If an agreement is ambiguous, its meaning is a question of fact.  <u>Id.</u>

respect to causation or with respect to damages.  That inquiry, however, does not impugn the

court's ability to certify a class for the purpose of deciding the common issues which underlie

plaintiff's and absentees' breach of contract claims: (1) whether a contract exists; and (2)

whether there was a breach.  As noted above, some amount of individualized inquiry can, but

does not necessarily, defeat class certification on some or all issues.  See Chiang, 385 F.3d 256 at

267 ("We note in this regard that courts commonly use Rule 23(c)(4) to certify some elements of

liability for class determination, while leaving other elements to individual adjudication–or,

perhaps more realistically, settlement."); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th

Cir. 2004) ("[I]t may be that if and when the defendants are determined to have violated the law

separate proceedings of some character will be required to determine the entitlements of the

individual class members to relief.").  Courts have flexibility to certify a class as to certain issues

pursuant to Rule 23(c)(4)(A), which provides that "[w]hen appropriate an action may be brought

or maintained as a class action with respect to particular issues."  The United States Court of

Appeals for the Third Circuit has long recognized and affirmed this flexibility.  See, e.g., Chiang,

385 F.3d 256 at 267, 273; Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985); Bogosian v.

Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).

     50.    Courts have recognized, particularly with respect to damages, that the necessity to

engage in some individual inquiry at the damages stage does not necessarily defeat certifying a

class for the purposes of determining liability over issues that are properly considered as part of a

class action.  See In Re Community Bank, 418 F.3d at 305-06.  As the court explained in

Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004):

        Often . . . there is a big difference from the standpoint of

> manageability between the liability and remedy phases of a class action. . . . [I]t may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief. . . . . That prospect need not defeat class treatment of the question whether the defendants violated [the law].

Id. (internal citations omitted).  The court also noted:

> Once [the question of liability] is answered, if it is answered in favor of the class, a global settlement . . . will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world.  Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues.  Those solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."

Id.  (quoting In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 141 (2d Cir. 2001)).

51.    In this case, liability issues that hinge upon whether there was a contract and whether there was a breach, and any related issues concerning language ambiguity, will be decided based upon questions of law or fact common to the members of the class.  A recent opinion issued by the United States District Court for the Eastern District of New York certifying a breach of contract class action is instructive.  In Steinberg v. Nationwide Mutual Insurance Co., 224 F.R.D. 67 (E.D.N.Y. 2004), the court noted that adjudication of the claims at issue would require the court to interpret key terms, definitions, and contractual provisions that were substantively similar if not identical in all of the defendant's relevant insurance contracts, and

49

that these contracts could be considered uniform or "form contracts" for the purposes of the litigation.  The court noted that "in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified." Id. (internal quotations and citations omitted).  This case, like Steinberg, involves common questions of law or fact that hinge upon determining whether contractual obligations exist based upon form contracts and generalized extrinsic evidence.  Though defendant argues that these issues necessarily require individualized determinations for each member of the putative class, the court finds that, at least with respect to the issues whether Ford had a contractual obligation to provide an upgraded radiator to purchasers of Ford F-150 trucks with towing and cooling options, and whether this obligation was breached by Ford with respect to plaintiff and members of the putative class, common issues of fact and law predominate over any individualized inquiries.

**2. Whether Class Action is Superior Method of Adjudication of the Controversy**

52.     As explained by the United States Court of Appeals for the Third Circuit most recently in In Re Community Bank, "[t]he superiority requirement asks a district court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternative methods" of adjudication.'" 418 F.3d at 277 (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd, 521 U.S. 591 (1997)).  Matters pertinent to this inquiry include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; [and] (D) the difficulties likely to be encountered
in the management of a class action.

Fed.R.Civ.P. 23(b).

53.     Here, considering the interest of members of the class in individually controlling

the prosecution or defense of separate actions, and balancing the merits of the class action device

with respect to efficiency and fairness with individual prosecutions, the court determines that the

interests of the members of the class weigh in favor of certification because the costs of

prosecution and the potentially numerous number of class members inform the court's

determination that the class action is the superior method.  Considering the extent and nature of

any litigation concerning the controversy already commenced by or against members of the class,

the court is only aware of this civil action seeking to certify a statewide class in the

Commonwealth of Pennsylvania and determines that this factor marginally weighs in favor of

certification.[31]  Considering the desirability or undesirability of concentrating the litigation of the

claims in the particular forum, the court notes that the class includes purchasers only in the

Commonwealth Pennsylvania and that no other alternative forum readily presents itself as more

desirable than this one given the membership of the class.  Considering the difficulties likely to

be encountered in the management of a class action, the court is sensitive to both the efficiency

gains and losses that are potentially attributable to certifying the class.  On the one hand,

certification should bring substantial efficiency gains because the multiple claims, approximately

_____

[31]While Ford argues that its customer satisfaction program is a superior method of
alternative dispute resolution, the class definition includes only those customers who did not
receive an updated radiator through the customer satisfaction program.  The class definition
could be further narrowed to include only those customers who did not receive any ameliorative
measures from Ford, or in the alternative, subclasses could be created for the purposes of
damages, if necessary.

51

2100 based on the record developed thus far, could be litigated in one forum, at one time.  On the other hand, the court is aware of the administrative burdens that maintaining and litigating a class action, especially one pursuant to Rule 23(b)(3) which requires adherence to Rule 23(c)(2)(B)'s notice provisions, can cause.  On balance, efficiency concerns weigh in favor of class certification.

54.   Plaintiff did not submit a proposed trial plan.  The submission of a proposed trial plan was contemplated by this court and the parties at the status conference held on November 2, 2005.  See (Doc. No. 23)(minute entry).  It was not included in the joint proposed scheduling order ultimately approved by the court.  The parties shall meet and confer and file a proposed trial plan within **twenty (20) days from the entry of this opinion.**

55.   Based upon the reasons set forth above, the court is satisfied that certification at this stage is appropriate with respect to (1) whether Ford had any contractual obligation to provide upgraded radiator to customers who purchased or leased F-150 trucks which were supposed to include the towing or cooling options; and (2) if so, whether there was a breach of this contractual obligation.  In addition, certification is appropriate for the purpose of the affirmative defenses against this breach of contract claim raised by Ford.  If the liability issue is determined unfavorably to the class then the case will be resolved.  If the liability issue is determined in favor of the class, then the court may consider on a fully developed record whether to decertify the class or to take other appropriate action.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for class certification (Doc. No. 30) is GRANTED.  An appropriate Order follows.

**V. ORDER**

AND NOW, this 27th day of September, 2006, upon consideration of plaintiff's motion

for class certification (Doc. No. 30), all related submissions, and the hearing held on April 28,

2006, and in accordance with this court's findings of fact and conclusions of law set forth herein,

IT IS HEREBY ORDERED that plaintiff's motion for class certification is GRANTED.  The

following class of plaintiffs shall be certified:

> All persons who purchased or leased in the Commonwealth of
> Pennsylvania a new model year 2000 or 2001 F-150 truck with
> either the Heavy Duty Electrical Cooling Group option or the Class
> III Trailer Towing option and did not receive a new upgraded
> radiator (1.42" (36mm) in thickness) from Ford Motor Company,
> Inc., either at the time of the purchase or lease, or as a free
> replacement thereafter.

IT IS FURTHER ORDERED that the class claims and issues shall be those set forth in

the Complaint (attached Notice of Removal at Doc. No. 1), and specifically (1) whether Ford had

any contractual obligation to provide upgraded radiator to customers who purchased or leased F-

150 trucks which were supposed to include the towing or cooling options; and (2) if so, whether

there was a breach of this contractual obligation.  In addition, certification is appropriate for the

purpose of the affirmative defenses against this breach of contract claim raised by Ford.

IT IS FURTHER ORDERED THAT the following shall serve as class counsel pursuant

to Federal Rule of Civil Procedure 23(g): Joseph N. Kravec, Jr. of Specter, Specter, Evans &

Manogue and Bruce D. Greenberg of Lite, DePalma, Greenberg & Rivas.

IT IS FURTHER ORDERED that the parties shall promptly meet and confer with respect

to a plan of class notice that complies with Rule 23(c)(2)(B) and directs to class members the

best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort, and which concisely and clearly states in plain, easily understood language:   (1) the nature of the action, (2) the definition of the class certified, (3) the class claims, issues, or defenses, (4) that a class member may enter an appearance through counsel if the member so desires, (5) that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and (6) the binding effect of a class judgment on class members under Rule 23(c)(3).  The parties shall submit a joint plan of class notice that complies with these requirements within twenty (20) days from the date of this Order.

By the court,


<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District Judge

cc:      Counsel of Record

54